UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:16-cv-9-FDW

| | |
|---|---|
| KURT KALANI SPARKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| HENDERSON COUNTY SHERIFFS ) | |
| OFFICE, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendant Kyle Collins, (Doc. No. 72). Plaintiff is represented by Ernest Charles Grose, Jr., and Meghann K. Burke.[1]

### I. BACKGROUND

### A. **Procedural Background**

Plaintiff filed this action under 42 U.S.C. § 1983 on July 27, 2015, alleging claims of excessive force and deliberate indifference to his medical needs by the Henderson County Sheriff's Office, Henderson County Sheriff's Officers Kyle Collins and Captain Chris Denny, Henderson County Sheriff Charles McDonald, Captain Player, Lieutenant McDonald, Henderson County Law Enforcement Commissioner, John Doe Officers # 1-3, and Jane Doe, the Nurse Administrator at the Henderson County Jail (the "jail"). (Doc. No. 1). On July 14, 2016, after initial review, this Court allowed the claims to proceed against Collins, John Does 1-3, and Jane

---

[1] Plaintiff filed this action pro se, but he is now represented by counsel.

Doe. (Doc. No. 33). The Court granted Plaintiff's motion to amend the Complaint and, on October 12, 2016, Plaintiff filed a Proposed Amended Complaint, in which he identified "John Doe 2" as FNU Newell, identified as a correctional officer at the jail. (Doc. No. 51). In the Amended Complaint, Plaintiff alleges that Defendant Collins used excessive force against Plaintiff and that the John Doe Defendants failed to intervene in the use of excessive force. Plaintiff also named as a Defendant Henderson County Sheriff Charles L. McDonald.

On August 4, 2017, Defendant Collins filed the pending summary judgment motion. (Doc. No. 72). On August 14, 2017, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 73). Plaintiff responded to the summary judgment motion on August 28, 2017, and Defendant filed a Reply on September 5, 2017. (Doc. Nos. 74, 75). On February 15, 2018, the parties filed a stipulation of dismissal as to Newell and McDonald, and agreed that Collins is the only remaining Defendant in this action. (Doc. No. 78 at 1).

**B.  Factual Background**

**1. Plaintiff Is Arrested on March 24, 2015, and Taken to Jail**

The Hendersonville Police Department ("HPD") arrested Plaintiff on March 24, 2015, for possession of methamphetamine and two counts of resisting a public officer. (Doc. No. 72-3 at 18:21-23; 20:23-25; 21:1: Pl. Dep.; Doc. No. 72-6: Collins Dec. Attachment A). After his arrest, HPD took Plaintiff to the jail. (Doc. No. 72-6 at ¶ 4). When an arrestee is brought to the jail, the arresting officer serves the warrant on the arrestee and then takes the arrestee before the magistrate to determine the conditions of release. (Id. at ¶ 3). HPD informed officers at the jail that Plaintiff refused to give them his real name. (Id. at ¶ 4). As a result, Plaintiff was served

2

with "John Doe" warrants for possession of methamphetamine, possession of marijuana, and two counts of resisting arrest. (Id., Attachment A).

After Plaintiff was served with the warrants, he was taken to Henderson County Magistrate Kathryn Carpenter to receive the conditions of his release. (Id. at ¶ 5). Plaintiff refused to give Magistrate Carpenter his name, and one of the conditions of his release was that he produce a valid form of identification and be fingerprinted. (Id. at ¶ 5, Attachment B; Doc. No. 72-3 at 82:24-25; 83:1-2). Plaintiff was then taken to the booking area for his photograph and fingerprinting to confirm his identity and make sure he had no outstanding warrants. (Doc. No. 72-6 at ¶ 3).

**2. Plaintiff Is Taken to Booking, Secured to a Bench, and Assessed by a Jail Nurse**

Before being photographed and fingerprinted, Plaintiff was placed on a bench in the booking area. (Doc. No. 72-6 at ¶ 6). He began moving around the bench and standing up and down, twisting around uncontrollably. (Id.). Plaintiff admits he was constantly moving around on the bench, but he attributes it to shooting pains across his body. (Doc. No. 72-3 at 27:7-12). As a result, Plaintiff could not sit up on the bench and was "moaning…writhing, like I—I was almost rolling where I was in pain." (Doc. No. 72-3 at 27:15-16). When Plaintiff tried to sit down on the bench, the pain wouldn't stop, and he lay down on the bench and started to cry. (Doc. No. 72-3 at 28:4-5).

Based on Plaintiff's erratic behavior, he was handcuffed to the bench. (Doc. No. 72-6 at ¶ 6; Doc. No. 72-3 at 22:13-17). Plaintiff asked the jailers and arresting officers to help him and do something because "he didn't know what was happening with my body." (Id. at 34:11). Plaintiff was writhing on the bench when Collins approached him and told him that he needed to sit up and shut up. (Id. at 30:7-10). Plaintiff said, "Please, you know, it hurts. Please help me."

(Id. at 35:22-23). Collins responded that Plaintiff needed to sit up and be quiet. (Id. at 35:24-25; 36:1). Collins then contacted the nurse on duty, Darla Dunaway, to assess Plaintiff. (Doc. No. 72-6 at ¶ 6). Dunaway talked with Plaintiff and asked him what was wrong. (Id. at ¶ 7). He informed her that he had recently used methamphetamine, his ribs were broken, and he wanted to go to the hospital.[2] (Id.). Nurse Dunaway assessed him and informed Collins that Plaintiff was impaired. (Id.). Dunaway offered Plaintiff a "packet of medication," but Plaintiff refused it "because [he] didn't know what was happening to me." (Doc. No. 72-3 at 36:23-25). During the entire time Dunaway was questioning him, Plaintiff was moving constantly on the bench, raising his arms over his head, and constantly twisting his body. (Doc. No. 72-6 at ¶ 7). Based on Plaintiff's disruptive and erratic behavior, Collins left him on the bench to give him time to calm down before beginning the booking process. (Id. at ¶ 8).

**C. Plaintiff Begins the Booking Process**

**1. Plaintiff Is Photographed**

About forty-five minutes to an hour later, Plaintiff was taken to the photograph and fingerprint machine. (Doc. No. 72-3 at 32:15-17). Collins took Plaintiff off the bench to start the booking process, but he did not remove Plaintiff's handcuffs due to his erratic behavior and earlier noncompliance. (Doc. No. 72-6 at ¶¶ 9-10). Collins walked Plaintiff to the photo station and Plaintiff became very tense along the way. (Id. at ¶ 10). Collins asked him to stand still to take his photograph, but Plaintiff initially refused Collins' instructions. (Id.). Plaintiff began

---

[2] At some point immediately before his arrest, Plaintiff fell off a 15-foot building and was also tased. (Doc. No. 72-3 at 48:13-16; 79:19-23; 80:1-3). Before his arrest, Plaintiff had not slept for two days, and consumed one to two milligrams of Xanax seven to eight hours before his arrest, and a small amount of amphetamines twelve to fourteen hours before his arrest. (Id. at 38:3-15; 75:2-23). Plaintiff also has bipolar disorder and other mental health issues. (Id. at 17:14-17).

swaying back and forth, and he started to clench up his body. (Id.). Plaintiff admits that he was not cooperating with Collins, but again attributes it to his ongoing pain. Plaintiff remembers "trying to breathe, trying to stand up, trying to stand up straight for them." (Doc. No. 72-3 at 47:15-16). Plaintiff had to lean against the wall, "trying to explain that I couldn't breathe, that I was having a problem, that I needed to lay down…That I felt like I was going to pass out." (Id. at 47:18-24). Instead of going through the photographing process, Plaintiff begged to be allowed to lie down while at the photograph area: "I remember just begging, please, just let me lay down, if just for a minute." (Id. at 47:22-24).

      Collins prompted Plaintiff to stand up. (Id. at 49:23-25; 50:1-5). Plaintiff once again conveyed to Collins and another deputy that he was having trouble breathing, but the only response he got was "stand there and shut up." (Id. at 50:18-19). Plaintiff was "constantly" complaining at the photo station that he couldn't stand up, and "it was just a constant—I need help. It was just over and over . . . I couldn't even stand up straight." (Id. at 51:22-25; 52:1-4). Collins believed that he needed to attempt to deescalate the situation, as Plaintiff appeared to be angry, so he maintained an open non-aggressive posture in talking to Plaintiff, and Plaintiff ultimately agreed to comply with Collins' request for him to take a photograph. (Doc. No. 72-6 at ¶ 10). After finally getting his photograph taken, Plaintiff was taken to the fingerprint area. (Doc. No. 72-3 at 53:19-23).

      2. Collins Attempts to Take Plaintiff's Fingerprints but Plaintiff Refuses Collins' Orders and Makes an Aggressive Move towards Collins

      The fingerprinting process is twofold: (1) having a picture taken to compare to the fingerprints and (2) having fingerprints taken. (Doc. No. 72-6 at ¶ 11). To begin the process, Collins asked Plaintiff to get his picture taken, but Plaintiff refused, stating, "You need to take

5

me to the hole right now." (Id.). Plaintiff does not deny refusing Collins' orders to get his picture taken at the fingerprinting station: "I just remember saying to them, please, please, just give me a minute. Let me sit down or at least let me—give me—give me a minute, let me lay down. Put me in a cell." (Doc. No. 72-3 at 55:12-15). Plaintiff also admitted to moving around at the fingerprinting station because:

> things [pain] started to get worse. My vision would blur. And like—and I remember the pain in my chest starting to get worse. And, like, there's just no way that I could make it stop. I remember just trying to move to make it quit. And like, you know, anything I could to just try to make it stop, and it wouldn't quit… I remember moving and to try to find different positions, like, to make it just quit.

(Id. at 54:1-6; 55:1-2).

Collins asked Plaintiff to hold still and allow his photograph to be taken. (Doc. No. 72-6 at ¶ 11). Plaintiff attempted to pull free from Collins' hand, so Collins grabbed him on the arm and told him to stop moving. (Id.). Plaintiff admits not complying with Collins' commands: "I remember saying it [requesting to lie down] repeatedly and being told, you're not doing shit until we get this done." (Doc. No. 72-3 at 56:15-16). Plaintiff then jerked away from Collins' arm and turned into Collins from about one to two feet away in an aggressive way. (Doc. No. 72-6 at ¶ 11). Plaintiff admits turning around and looking at Collins from one foot away, and yelling "[t]hen hurry the hell up, man, because I can't take this." (Doc. No. 72-3 at 56:17-18, 23-25; 57:2-4; 107:13-25; 108:1-5). In fact, when he viewed the portion of the video where he turns towards Collins, Plaintiff admitted that he looked "in distress and very concerned." (Id. at 106:24-25; 107:1-2).

Collins states in his declaration that, based on Plaintiff's initial refusals to give his name to HPD and Magistrate Carpenter, his admission of drug use, Nurse Dunaway's opinion that

6

Plaintiff was impaired, and Plaintiff's erratic behavior on the bench as well as during the photographing and fingerprinting process, Collins believed that Plaintiff was going to assault him. (Doc. No. 72-6 at ¶ 11). Immediately after turning into Collins and yelling at him from one foot away, Collins took Plaintiff down by placing his hand on Plaintiff's neck and pushing him to the ground. (Doc. No. 72-3 at 58:15-21; Doc. No. 72-6 at ¶ 12). Plaintiff was on the ground for approximately 45 seconds while Officers Brown and Ware assisted in gaining control of Plaintiff. (Doc. No. 72-6 at ¶ 12; Doc. No. 72-3 at 97:16-18; 97:6-9). Plaintiff did not appear to be injured, but Collins received a small bruise and slight swelling of his left eyebrow after hitting the floor. (Doc. No. 72-6 at ¶ 14).

### 3. Plaintiff Is Seen by Medical Staff

After being taken to the ground, Plaintiff was taken to a holding cell. (Doc. No. 72-3 at 60:21-23; Doc. No. 72-6 at ¶ 13). Collins contacted the nursing staff to assess Plaintiff. (Doc. No. 72-6 at ¶ 13). A nurse came to his door and Plaintiff asked her to obtain an x-ray of his wrists. (Doc. No. 72-3 at 39:21-24). X-rays were taken and they came back negative for a fracture. (Id. at 40:3-9). That same day, Plaintiff saw a mental health professional, Karen Stewart, and told her he was intoxicated on methamphetamine. (Doc. No. 72-9 at ¶ 4: Stewart Dec.; Doc. No. 72-3 at 77:3-6). Stewart asked the nurse if they could give Plaintiff medicine for withdrawal, and he received some medicine for withdrawal. (Doc. No. 72-3 at 77:17-19). Plaintiff bonded out several days later and subsequently filed a grievance over the incident.

### II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the

non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

## III. DISCUSSION

### A. Plaintiff's Excessive Force Claim as to Defendant Collins

As Plaintiff was a pre-trial detainee when the incident occurred, his excessive force claim is analyzed under the Fourteenth Amendment.[3] Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015). To prevail on his excessive force claim, Plaintiff must establish that the force used was objectively unreasonable. Id. In Kingsley, the Supreme Court set forth several, non-exclusive factors in assessing whether an officer's use of force was reasonable:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the Plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. at 2473 (citing Graham v. Connor, 490 U.S. 386, 395, 396 (1989)). In assessing whether Defendant used excessive force, this Court must make that determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Bell v. Wolfish, 441 U.S. 520, 540 (1979)). In addition, the Court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and

---

[3] Although Kingsley was decided after March 24, 2015, Defendant acknowledges that it applies retroactively for purposes of whether Defendant violated Plaintiff's constitutional right to be free from excessive force. Johnson v. Conway, 688 Fed. Appx. 700 (11th Cir. 2017) (unpublished) (applying Kingsley to incident that occurred in 2011); Tims v. Golden, No. 15-0516-WS-B, 2016 WL 1312585, at *8 (S.D. Ala. Apr. 4, 2016) ("The Court concludes that Kingsley applies retroactively.").

practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Id.

Applying the Kingsley factors, the Court finds that Defendant's use of force was objectively reasonable. First, the relationship between the need for force and the amount of force used to restore discipline was closely matched. From the time he was arrested when he refused to give his name to HPD until he was taken down by Collins, Plaintiff repeatedly refused verbal commands to sit down, stand still, and get his photograph taken. Despite Plaintiff's erratic behavior, no force was used while Plaintiff was on the bench or when he was being photographed. In fact, when Collins felt that Plaintiff was getting angry at the photograph area, Collins was able to talk Plaintiff into complying with Collins' request to take a photograph. (Doc. No. 72-6 at ¶ 10). Unfortunately, Collins did not have that luxury when the fingerprinting process began: "I believed that Mr. Plaintiff was going to assault me when he turned into me. I believed that if I tried to continue to talk to Mr. Sparks, he would have assaulted me." (Id. at ¶ 11). As a result, the force began after Plaintiff admittedly refused orders to cooperate with the fingerprinting process, and acted aggressively towards Collins, and ended when Plaintiff was taken to the ground. (Id. at ¶¶ 11-12). No force was used after Plaintiff was taken to the ground, and Collins did not make any threats or gratuitous comments.[4] Wilson v. Flynn, 429 F.3d 465, 468-69 (4th Cir. 2005) (in analysis under Graham v. Conner, where the court found it "significant that [plaintiff] admits that the allegedly excessive force ceased after the officers handcuffed him"). Collins' takedown of Plaintiff was proportional, if not less, force than was

---

[4] Plaintiff does not recall Collins saying anything to him, but he does recall Sergeant Newell saying "I knew we were going to have problems out of this son of a bitch." (Doc. No. 72-3 at 61:2-7; 65:1-4).

warranted based on Plaintiff's aggressive and erratic behavior.

Second, Plaintiff only suffered minimal injuries from being taken to the ground. The medical records reflect that Plaintiff had "some edema" (swelling) to his wrist and his x-rays were negative.[5] (Doc. No. 72-3, Dep. Ex. 1). While the Supreme Court has rejected the notion that de minimis injuries are not actionable in excessive force claims, a de minimis injury may suggest that the "use of force could plausibly have been thought necessary," Whitley v. Albers, 475 U.S. 312, 321 (1986) and it may provide some indication of the amount of force applied. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010).

Third, Collins attempted to prevent additional uses of force by only taking Plaintiff to the ground—further evidence of Collins' attempt to temper or limit the amount of force used. (Doc. No. 72-6 at ¶¶ 11-12). That is, it is undisputed that none of the officers punched, kicked, or otherwise used any other force against Plaintiff—the only force used was the takedown itself.

Fourth, from Collins' perspective, and the perspective of a reasonable police officer, the threat to him was serious. Here, it is undisputed that Plaintiff: (1) had refused to give his name to anybody, which might indicate that he was trying to hide something; (2) acted erratic on the bench; (3) refused to follow orders on the bench and during the photographing process; (4) refused to do the fingerprinting process; and (5) had previously consumed illicit drugs (which Collins knew at the time he used force). Moreover, in his sworn declaration, Collins described the circumstances just before he used force against Plaintiff:

> After his photograph was taken, I took Mr. Sparks to the fingerprinting station to be fingerprinted. . . . I asked Mr. Sparks to get his picture taken, and he refused, stating, "You need to take me to the hole right now." I asked Mr. Sparks to hold

---

[5] Plaintiff admitted that the x-ray showed no fracture to his wrist. (Doc. No. 72-3 at 40:3-9). Although he claims that he suffered nerve damage to his wrist, he could not produce any medical records to support this diagnosis. (Id. at 40:19-25; 41:1-6).

11

> still and allow us to take his photograph. He attempted to pull free from my hand, so I grabbed him on the arm and told him to stop moving. He then resisted once again by yelling and jerking away his arm and trying to turn around into me from about one to two feet away in an aggressive way. Based upon his initial refusals to give his name, his admission of drug use, his erratic behavior on the bench and during the photographs and fingerprinting process, I believed that Mr. Sparks was going to assault me when he turned into me. I believed that if I tried to continue to talk to Mr. Sparks, he would have assaulted me.

(Doc. No. 72-6 at ¶ 11). As the Supreme Court has stated, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989).

Last, Plaintiff was admittedly actively resisting orders until he was taken down and restrained. Courts confronting similar scenarios have found no constitutional violation. See, e.g., Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999) (where the plaintiff was first pepper-sprayed after he tried to get out of the cell, was then moved to another cell, and during that move was pinned down and punched by an extraction team, upholding the grant of summary judgment because "officers obviously felt the need to subdue [plaintiff] either to calm the general environment or to prevent [plaintiff] from hurting himself. If we fail to accord due deference to officers' efforts, we would be giving encouragement to insubordination in an environment which is already volatile enough."); Rojo v. Holderbaum, No. 8-15-cv-1982-T-33JSS, 2016 WL 7116207, at *8 (M.D. Fla. Dec. 7, 2016) (where, during the booking process, the plaintiff became argumentative and walked towards the defendant officer, and where the officer responded by punching the plaintiff in the face, fracturing his nose, finding that the defendant's conduct was reasonable under Kingsley); Heathershaw v. Phoenix Police Dep't, No. CV-14-

12

01615-PHX-DLR, 2016 WL 1408265, at *3 (D. Ariz. Apr. 11, 2016) (where the plaintiff was a pretrial detainee, holding that the defendant officer "used force to compel compliance with officer demands only after Plaintiff refused to remove his hands from under his body during the fingerprinting and handcuffing process").

Here, Collins used force only to prevent being assaulted and because Plaintiff was admittedly not complying with his requests during booking. The <u>Kingsley</u> factors weigh in favor of finding that Collins' use of force was reasonable under the circumstances and not excessive. Thus, Plaintiff's excessive force claim fails as a matter of law.[6]

In response to the summary judgment motion, Plaintiff argues that three facts support his claim that there are genuine issues of material fact concerning Collins' use of force: (1) Plaintiff was in a medical crisis or emergency; (2) he was not resisting Collins; and (3) he was handcuffed when the use of force occurred. These facts do not create a genuine issue of disputed fact sufficient to overcome Defendant's summary judgment motion.

First, it is immaterial whether Plaintiff was acting erratically because he was in a "medical crisis." That is, it is not material <u>why</u> Plaintiff was acting erratically, but only that he was admittedly acting erratically. The Supreme Court has made clear that in assessing whether an officer used excessive force, a court must make that determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20

---

[6] As Collins notes, he had the following options when Plaintiff turned around, yelling at him from one foot away: (1) ignore Plaintiff; (2) tell him to be quiet; (3) use other force like punching Plaintiff in the face; or (4) do what he did—take Plaintiff down. Any of these alternatives presented their own problems. For instance, acceding to Plaintiff's wishes to go to a cell would give other detainees the idea that they could dictate to officers what would occur during the booking process. Second, Collins had previously told Plaintiff to be quiet on the bench and during the booking process and that was not successful. Third, punching Plaintiff in the face would have caused more serious injuries to Plaintiff.

vision of hindsight." Kingsley v. Hendrickson, 135 S. Ct. at 2473. From Collins' perspective, Plaintiff: (1) refused to give his name to Hendersonville officers or the magistrate[7]; (2) was intoxicated according to the nurse; (3) admitted using drugs; (4) refused to sit still on the bench; (5) refused to cooperate during the photographing process; and (6) refused to cooperate during the fingerprinting process. See (Doc. No. 72 at pp. 5-10). While Plaintiff may have been undergoing a "medical crisis," he was admittedly acting erratically.

Second, Plaintiff's claim that he was not resisting is belied by both the video and his response itself.[8] For instance, in his response, he acknowledges moving around on the booking bench, being told to be quiet and continuing to yell, refusing to cooperate at the fingerprint machine, refusing to stand up at the photograph machine, and moving around right before Collins took him down.

In his response to Defendant's summary judgment motion, Plaintiff also argues that the

---

[7] Plaintiff's claim in his response that he was booked as John Doe because Hendersonville police officers thought he was someone else they were looking for is belied by the fact that the magistrate's order required Plaintiff to give his real name before he was released. See (Doc. No. 72-8).

[8] The Court agrees with Defendant that Plaintiff's footnote about an adverse inference instruction related to spoliation is misplaced. That is, Plaintiff suggests that Defendant intentionally failed to preserve part of the vide footage of Plaintiff in the booking area. As Plaintiff admitted in his deposition, however, the video portion allegedly not preserved did not relate to either Plaintiff's excessive force claim or deliberate indifference claim, but rather him sitting on a bench hours before the incident with Collins. See (Doc. No. 72-3 at 11:22, 14:7-12 ("I would say that it did depict the incident, I believe as described in my Complaint"). See Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 520-21 (D. Md. 2010) (one of the factors used by district courts in spoliation claims is whether evidence was relevant to the claims or defenses of the party). Furthermore, the videos were not requested by Plaintiff, and Defendant voluntarily produced four videos. See (Doc. No. 72-2: Sean F. Perrin Dec.; Doc. No. 75-4, Ex. 1B). As a result, there can be no "culpable state of mind" required for a spoliation instruction. Victor Stanley, 269 F.R.D. at 520-521. See also City Grill Hospitality Group, Inc. v. Nationwide Mutual Ins. Co., No. 5:12cv610-F, 2014 WL 1429552, at *3 (E.D.N.C. Apr. 14, 2014) (noting that spoliation requires a "culpable state of mind").

14

video shows him handcuffed. (Doc. No. 74 at 1). Defendant has never denied that Plaintiff was handcuffed. Since both parties agree that Plaintiff was handcuffed during the booking process, and the video does not "blatantly contradict" any party's claim on that issue, the video is treated as a piece of evidence like any other. Witt v. West Va. State Police, Troop 2, 633 F.3d 272, 277 (4th Cir. 2011). The video also corroborates Collins' claim, and Plaintiff's candid admission, that Plaintiff turned around and yelled at Collins from one foot away immediately before the takedown.[9] See (Doc. No. 72 at pp. 9-10). At 14:53:09 on the video, Plaintiff turns around towards Collins with an angry look on his face, and appears to be yelling at him. While the video has no audio, the anger in Plaintiff's face and eyes is clear.

Third, the fact that Plaintiff was in handcuffs does not make Collins' use of force per se objectively unreasonable. See, e.g., Beale v. Madigan, No. 5:11-CT-3244-F, 2014 WL 12513870, at *5 (E.D.N.C. Aug. 26, 2014) (unpublished) (holding that, although the plaintiff was handcuffed, the use of force was reasonable under the Fourteenth Amendment because "Plaintiff was in a detention center and swinging his body wildly in an attempt to disobey instructions"), affirmed after remand in light of Kingsley, 668 Fed. Appx. 448 (4th Cir. 2016); Pashova v. Geist, No. 1:09cv340-JD, 2012 WL 1074072, at *12 (N.D. Ind. Mar. 29, 2012) (holding that the use of a taser on an arrestee in a restraint chair was objectively reasonable under the Fourth Amendment because, although the plaintiff was not resisting arrest or attempting to evade arrest by flight, she was indisputably interfering with the officers' execution of their duties); Stormer v. Koon, No. 1:08cv813, 2010 WL 1257592, at *6-7 (S.D. Ohio Mar. 30, 2010)

---

[9] Although Plaintiff admitted turning around and yelling at Collins, see Doc. No. 72 at pp. 9-10, he now claims his actions were caused by a "medical condition." (Doc. No. 74 at p. 5). As discussed, supra, the reasons for his conduct is not relevant—what is relevant is how Collins perceived the conduct.

15

(the defendants' use of knee strikes and fist strikes were reasonable under the Fourteenth Amendment even though the plaintiff was handcuffed and lying down in cell where the plaintiff kicked defendants and spit blood at them because "the punches were inflicted in a good faith effort to make Plaintiff stop resisting and to make him stop spitting blood at the officers").

Finally, as discussed, supra, the reasonableness of Collins' use of force is also clear from Plaintiff's minimal injuries. While Plaintiff claims in his response he has been diagnosed with "right-sided radiculopathy," he has not produced any medical records to support this "diagnosis" and readily admitted that he cannot do so. When asked in his deposition about when he was diagnosed with "right-sided radiculopathy," Plaintiff replied, "I'll have to get those records, in order to give you that answer. We have not—we have not done that yet. I think that needs to be done." See (Doc. No. 72-3 at 41:4-6). As a result, the only competent evidence before the Court is that Plaintiff suffered swelling to his wrist, a de minimis injury. See (Doc. No. 72 at p. 14). See Mason v. Wexford Health Sources, No. 2:10cv55, 2011 WL 7070535, at *13 (N.D. W. Va. Dec. 14, 2011) (in a deliberate indifference case, rejecting the plaintiff's contention that he suffered permanent injury as a result of his inadequately treated recurrent MRSA infections, where "review of plaintiff's attached medical records reveals absolutely no evidence to support this claim").

In sum, for the reasons stated herein, Defendant Collins is entitled to summary judgment as to Plaintiff's excessive force claim against him.

**B. Plaintiff's Deliberate Indifference Claim as to Defendant Collins**

An inmate's right to adequate medical care is violated only when a jail official acts with "deliberate indifference" to "a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 827, 828 (1994). Deliberate indifference "is a very high standard—a showing of mere

16

negligence will not meet it." Grayson, 195 F.3d at 695. To demonstrate that Collins was deliberately indifferent and violated his rights, Plaintiff must establish that (1) he was detained under conditions posing a substantial risk of serious harm; and (2) Collins knew it and disregarded an excessive risk to his or her health or safety. Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001).

For Collins to be held liable for deliberate indifference, he must have done nothing to ameliorate the situation after being both "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998) (internal citations omitted). Notably, a jail official's "failure to take further action once he had referred the matter to the medical providers can[not] be viewed as deliberate indifference." Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005). Here, Collins contacted the nurse when Plaintiff was lying on the bench complaining about being in pain, and also after the incident. (Doc. No. 72-6 at ¶¶ 6, 13). In addition, the jail's mental health professional, Stewart, saw Plaintiff immediately after the incident and the next day. (Doc. No. 72-9 at ¶¶ 4-5). Any disagreement Plaintiff might have with the treatments he received does not equate to deliberate indifference. Jackson v. Sampson, 536 Fed. Appx. 356, 357 (4th Cir. 2013). Since Collins was not deliberately indifferent to a serious medical need, he committed no constitutional violation, and he is therefore entitled to summary judgment.

In response to the summary judgment motion, Plaintiff admits he received a "packet of medication" before the incident with Collins and that he saw a nurse after the incident. (Doc. No. 74 at pp. 4-5). His complaints are that Collins never "took him to the doctor" or "helped determine the nature of his medical emergency." (Id. at pp. 2, 5). In doing so, Plaintiff

17

misconstrues the standard for a deliberate indifference claim. Plaintiff must show that Collins knew about and disregarded an excessive risk to Plaintiff's health and safety. Plaintiff's claim that "[w]hether Officer Collins referred Mr. Sparks to the nurse prior to the takedown is in dispute" is erroneous. (Doc. No. 72-6 at p. 13). Collins' declaration is clear: "I contacted the nurse on duty, Darla Dunaway, to assess Mr. Sparks after he complained about having a heart attack." See (Doc. No. 72-6 at ¶ 6). In fact, Plaintiff admits seeing the nurse before the incident with Collins. (Doc. No. 74 at p. 4). Indeed, Collins was present two times when a nurse saw Plaintiff both before and after the incident, see Doc. No. 72 at pp. 6, 10, and it was certainly reasonable for Collins to rely on the nurse's medical expertise that Plaintiff was not in medical distress. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (officials entitled to rely on judgment of medical personnel); Shelton v. Angelone, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("[p]rison personnel may rely on the opinion of the medical staff as to the proper course of treatment." ); Strange v. O'Brien, No. 7:10-cv-0151, 2010 WL 8750304, at *4 (W.D. Va. July 20, 2010)("[w]ithout any medical expertise of his own, however, O'Brien rightfully relied on the professional judgments of his medical staff as to the appropriate course of treatment for Strange's injured foot, and in so doing, was not deliberately indifferent to a risk of harm known to him."). In addition, there is also no evidence that Plaintiff's condition worsened, was life-threatening, and that Collins "intentionally ignored the situation and refused to seek medical assistance." Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986). As a result, Plaintiff's deliberate indifference claim fails.

In sum, for the reasons stated herein, Defendant Collins is entitled to summary judgment

as to Plaintiff's deliberate indifference claim.[10]

## IV. CONCLUSION

For the reasons stated herein, the Court will grant summary judgment to Defendant Collins and dismiss this action with prejudice.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 72), is **GRANTED**, and this action is dismissed with prejudice.

2. The Clerk is directed to terminate this action.

Signed: March 21, 2018

Frank D. Whitney
Chief United States District Judge

---

[10] Defendant raised qualified immunity as a defense to Plaintiff's excessive force and deliberate indifference claims. Because the Court has determined that there was no constitutional violation in the first instance, the Court does not need to determine whether Defendant is entitled to qualified immunity. The Court observes, however, that even if the Court were to find that a genuine issue of dispute existed as to whether Defendant violated Plaintiff's constitutional rights, Defendant would clearly be entitled to qualified immunity.